EILEEN A. O'MALLEY, Plaintiff-Appellant, v. THE VILLAGE OF PALOS PARK, Defendant-Appellee.

First District (1st Division) No. 1—02—1730

Opinion filed February 23, 2004.

Connelly, Roberts & McGivney, L.L.C., of Chicago (Thomas R. Rakowski, of counsel), for appellant.

Klein, Thorpe & Jenkins, Ltd., of Chicago (Thomas P. Bayer, Lance C. Malina, and Kathleen T. Henn, of counsel), for appellee.

JUSTICE McBRIDE delivered the opinion of the court:

This is an appeal from a summary judgment order entered in favor of defendant-appellee, the Village of Palos Park (Village), and against plaintiff-appellant, Eileen O'Malley. In 1981, the Village and O'Malley entered into an annexation agreement where certain property in Palos Park, Illinois, commonly known as the Palos Park County Club (the Property) would be annexed into the Village. In 1994, the parties, by way of another contract (the 1994 agreement), extended the original annexation agreement to the year 2001, and O'Malley submitted a development concept plan to the Village for the purpose of developing the Property. The Board of Commissioners of the Village of Palos Park (Village Board)[1] approved the development plan "subject to confirmation that the [1994 agreement] was in order." The Village Board later rejected the development plan on the basis that the 1994 agreement was invalid because no notice and public hearing were held prior to its execution as required by section 11—15.1—3 of the Illinois Municipal Code. 65 ILCS 5/11—15.1—3 (West 2000).

O'Malley thereafter brought suit and her original complaint against the Village alleged causes of action for declaratory relief (count

---

[1]The parties use the terms "Village Board," "Village Council," and "Council" interchangeably to describe the same entity, but we will consistently refer to this entity as the Village Board.

I), and theories of estoppel (count II), breach of contract (count III), and disconnection (count IV). She then filed an amended complaint which alleged a one-count claim for breach of contract (count I). On August 3, 2001, O'Malley filed a second amended complaint which alleged only that her "vested right" to approval of the development plan had been violated.

The Village filed an amended motion for summary judgment on O'Malley's second amended complaint. On May 15, 2002, the trial court granted that motion, finding that the Village Board's vote to approve the development plan "subject to confirmation that the [1994 agreement] was in order," "was not such an approval as to create a vested right."

The following background facts are relevant to our disposition of the issues. On August 10, 1981, the Village and O'Malley entered into an annexation agreement (1981 agreement) which provided that the Property would be annexed into the Village. The 1981 agreement lasted for a term of 10 years, provided for R—1 residential zoning, and permitted plaintiff to apply for special development district classification zoning upon revision of the Village's zoning code. Several years later, the Village Board adopted a zoning ordinance (chapter 1273) to provide for a special development district classification known as the "S—1 Planned Unit Development" (S—1 PUD) district on February 25, 1985. On May 13, 1985, the Village Board voted to rezone the Property as S—1 PUD.

The ordinance, chapter 1273.05(d), states, in relevant part:

"(3) *Action by Plan Commission.* Following the conclusion of the public hearing and its deliberations thereof, the commission shall submit its findings in a report to Council,[2] including a recommendation that the development concept plan be approved, approved subject to modification[,] or not approved.

(4) *Action by Council.* Following receipt of the formal recognition of the Commission, Council shall:

A. Refuse to approve the development concept plan;

B. Refer it back to the commission for further consideration of specified matters; or

C. By ordinance duly adopted, approve the development concept plan with or without modifications as a condition of such approval, grant a special use for the planned unit development, assign an S—1 zoning classification on the property and take such additional actions as may be necessary to permit the subject development.

(5) *Effect of Approval.* A development concept plan which has

---

[2]As indicated above, the Council is the same entity as the Village Board.

been approved shall not be modified, revoked or otherwise impaired, and the land use arrangement, intensity of use and other zoning and bulk standards established by the development concept plan shall remain intact and run with the land unless modified by further ordinance pursuant to the required public hearing process as outlined in this section." Village of Palos Park Planning & Zoning Code ch. 1273.05(d) (1985).

On June 27, 1994, the parties entered into the 1994 agreement, which extended the 1981 agreement to August 9, 2001. The 1994 agreement also contained an amendment that stated: "Paragraph 3(c) of the [1981 agreement] is amended by deleting 'eight dwelling units per acre' and inserting '7 dwelling units per acre.' " Another amendment was that "all other provisions of the [1981 agreement] *** shall remain the same."

Paragraph 8 of the 1981 agreement stated, in pertinent part, "[O'Malley] and subsequent owners shall comply and be subject to all ordinances, resolutions, rules and regulations of the VILLAGE, including every governmental body having jurisdiction thereof which now or hereafter may be in effect."

On June 26, 1997, O'Malley sought to move forward with her development plan. The minutes of the Village plan commission meeting on June 26, 1997, indicate that O'Malley thought all the Village development requirements had been satisfied based on the 1981 agreement. However, a Village official informed O'Malley that engineering standards had changed since the Property was annexed and that the documents provided by O'Malley would serve as a preapproval conference, but that she must submit documents in compliance with chapter 1273.

The Village plan commission posted a notice that a public hearing would be held on September 18, 1997, "to consider the proposals of the Palos Park County Club for their Concept Plan under the requirements of Village Code Ch. 1273.05(c), S—1 Planned Unit Development." The September 18, 1997, public hearing was continued until October 16, 1997. After the public hearing on October 16, 1997, the Village plan commission met. The minutes of the October 16, 1997, plan commission meeting indicate that the commission would consider approving O'Malley's development plan "contingent upon the submittal of five (5) items listed by the Village engineer." Ralph Jones III, of the Village plan commission, sent a letter to the Village Board dated October 24, 1997, stating the plan commission moved to approve O'Malley's development plan contingent upon the Village engineer's recognition that the five items had been submitted.

The Village Board met on November 10, 1997, to consider

O'Malley's development plan. Peter Downey, an attorney for O'Malley, stated that "he was appearing before the [Village Board] to seek approval of the concept plan, which was the first stage of development, and would enable them to move forward to the next step of the proposed project." At one point during the meeting, a citizen voiced his concerns about the proposed development, including the fact that he was not notified of any public hearings for the extension of the 1981 agreement in 1994. The mayor stated that "he did not believe that a public hearing was necessary to extend an agreement." At the end of the meeting the Village Board approved the development plan, "subject to confirmation that the 1994 extension to the annexation agreement was in order."

On November 24, 1997, the Village Board met again and the mayor stated that an individual indicated at the November 10, 1997, meeting that no public notice had been given and that no public hearing had been held prior to the approval of the 1994 agreement. Because of this individual's concern, the mayor noted that the approval of the development plan was contingent upon all required public notices and hearings having been given and held relative to the 1994 agreement. He then said, based on a review of the Village records, "Village staff *** determined that there was no public notice published, and no public hearing held, in regard to" the 1994 agreement. Thus, the Village attorney was directed to research the ramifications of this issue on the development review process with regard to O'Malley's development plan. Because approval of the development plan was contingent upon a public hearing having been held, the development plan was not formally approved and further action on the development plan was tabled until the meeting on January 26, 1998.

On January 26, 1998, the Village Board adopted a motion nullifying the 1994 agreement on the ground that it had been approved without a public hearing. The record shows that O'Malley was given the option of requesting a new public hearing for the purpose of evaluating the amendment to the 1981 agreement and putting the 1994 agreement back into place.

In lieu of requesting another public hearing, O'Malley filed a four-count complaint against the Village on August 2, 1999. As pointed out above, the original complaint sought a declaratory judgment (count I) and alleged theories of estoppel (count II), breach of contract (count III), and disconnection (count IV).

In subsequent court proceedings counts I, II, and IV of the original complaint were all dismissed. On January 9, 2001, O'Malley filed an amended complaint, which alleged only a breach of contract.

On March 12, 2001, a hearing on the Village's amended motion for

judgment on the pleadings was held. The Village argued that the 1994 agreement was invalid under section 11—15.1—3 of the Illinois Municipal Code because no notice had been given and no public hearing had been held prior to its execution. The trial judge stated that he was inclined to agree that the 1994 agreement was invalid because no notice and no public hearing had been held prior to its execution, but the judge continued the matter for further briefing on the issue.

Section 11—15.1—3 of the Illinois Municipal Code, which applies to annexation agreements and all amendments to annexation agreements, requires municipal authorities to "hold a public hearing upon the proposed annexation agreement or amendment" and to "give notice of the proposed agreement or amendment not more than 30 nor less than 15 days before the date fixed for the hearing." 65 ILCS 5/11—15.1—3 (West 2000).

Section 11—15.1—5 of the Illinois Municipal Code states that any "annexation agreement executed prior to October 1, 1973, *** is hereby declared valid and enforceable as to such provisions for the effective period for such agreement, or for 20 years from the date of the execution thereof, whichever is shorter." 65 ILCS 5/11—15.1—5 (West 2000). It further states that the effective term of any annexation agreement "executed prior to the effective date of this Amendatory Act of 1985 may be extended to a date which is not later than 20 years from the date of execution of the original Annexation Agreement." 65 ILCS 5/11—15.1—5 (West 2000). This statutory section has no language requiring a hearing or notice.

On April 9, 2001, the trial court denied the Village's amended motion for judgment on the pleadings, but dismissed the first amended complaint on the basis that the 1994 agreement was invalid and *ultra vires*.

On June 21, 2001, the trial court granted O'Malley leave to file a second amended complaint. On August 3, 2001, O'Malley filed a second amended complaint, which alleged only that she had a vested right to the approval of her development plan and that she was entitled to damages. On May 15, 2002, the trial court granted the Village's motion for summary judgment on the basis that the approval of the development plan, which was subject to confirmation that the 1994 agreement was in order, was not a vested right. O'Malley appeals the orders entered by the trial court on March 12, 2001,[3] April 9, 2001, and May 15, 2002.

O'Malley seeks review of the trial court's finding that the 1994

---

[3]The record indicates on March 12, 2001, the trial court continued the matter for further review and no final order was entered that day.

agreement was invalid, in particular, the April 9, 2001, order dismissing her amended complaint. She also contends that the summary judgment order entered May 15, 2002, was in error. As noted above, O'Malley alleged a breach of contract claim in her original and amended complaints based on the 1994 agreement. She then dropped these claims in her second amended complaint and alleged only that she had obtained a vested right in the approval of her development plan. The Village argues that any breach of contract claim based upon the 1994 agreement has been waived because O'Malley failed to replead this cause of action in her second amended complaint.

O'Malley argues that the waiver rule may be relaxed in certain cases, and she relies upon *American Federation of State, County & Municipal Employees, Council 31 v. County of Cook*, 145 Ill. 2d 475, 480, 584 N.E.2d 116 (1991) (*AFSCME*).

In *AFSCME*, the plaintiff (AFSCME) appealed a decision by the appellate court which held that the defendant, Cook County, was not required to bargain over the effects of an examination requirement imposed by the civil service commission for three incumbent employees. These employees held "Computer Operator I" positions at Cook County Hospital and they were hired before the examination requirement was established. Under the collective bargaining agreement between AFSCME and Cook County, AFSCME took the position that Cook County was required to bargain over whether the three incumbent employees should be required to take the examination. The basis for this argument was that, because of Cook County's status as a home rule unit, it was not bound by the civil service provisions of the Illinois Counties Code. 55 ILCS 5/1—1001 *et seq.* (West 2000) (formerly Ill. Rev. Stat. 1991, ch. 34, par. 1—1001 *et seq.*). AFSCME also insisted that the employees be "grandfathered" into their positions. In response, Cook County argued that it was barred by state law from bargaining on behalf of the employees under certain civil service provisions in the Counties Code, cited above.

AFSCME filed an unfair labor practice charge with the plaintiff, the Illinois Local Labor Relations Board (Board), and the Board found that Cook County had failed to bargain in good faith with regard to the impact of the examination requirement upon the three employees. The Board specifically found that Cook County had violated section 10(a)(4) of the Illinois Public Labor Relations Act by not bargaining over the test requirement, and declared it an unfair labor practice for Cook County to refuse to bargain collectively in good faith with a public employee union. 5 ILCS 315/10(a)(4) (2000) (formerly Ill. Rev. Stat. 1987, ch. 48, par. 1610). Contrary to the Board's decision, the appellate court found that Cook County was not required to bargain over

the effects of the examination requirement and reversed the finding of the Board.

On review to the supreme court, AFSCME argued that the appellate court ignored legal precedent supporting AFSCME's claim and had erroneously distinguished the supreme court's decision in *City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268*, 122 Ill. 2d 353, 522 N.E.2d 1219 (1988). That decision required the City of Decatur to bargain collectively over AFSCME's proposal that the city's employees be permitted to submit disciplinary grievances to arbitration. *AFSCME*, 145 Ill. 2d at 481-82, citing *City of Decatur*, 122 Ill. 2d at 361-62. The *City of Decatur* decision also set out the Illinois public policy that favors public employee bargaining laws over the optional, rather than mandatory, civil service laws adopted by Decatur. *AFSCME*, 145 Ill. 2d at 482, citing *City of Decatur*, 122 Ill. 2d at 365-66.

In *AFSCME*, the plaintiff (AFSCME) specifically claimed that the appellate court ignored the policy, established in *City of Decatur*, favoring public employee bargaining laws over civil service laws and erroneously found that *City of Decatur* was limited to arbitration issues. The supreme court agreed that the decision in *City of Decatur* was squarely on point because it involved whether the City of Decatur, under section 7 of the Illinois Public Labor Relations Act, had a duty to bargain collectively despite limiting language in section 7 which would supplant certain statutory civil service provisions. Based on *City of Decatur*, the supreme court held that Cook County was required to bargain with AFSCME over the effects of requiring the three incumbent employees to take the proposed civil service examination. *AFSCME*, 145 Ill. 2d at 482.

We note that the threshold issue in *AFSCME* was whether the appellate court, on the basis of waiver, had properly refused to consider AFSCME's argument that Cook County was not bound by the civil service provisions of the Counties Code because of its status as a home rule unit. The appellate court held that this argument had been waived because AFSCME failed to raise it in the hearing before the Board. The supreme court found that, even if AFSCME waived the argument, it would consider the claim based upon the court's authority to take judicial notice of Cook County's status as a home rule unit of local government. *AFSCME*, 145 Ill. 2d at 480.

■ The supreme court noted that it was well established that courts may take judicial notice of their state's statutes and constitutional provisions. *AFSCME*, 145 Ill. 2d at 480. It also observed that the waiver rule was an admonition to litigants, not a limitation upon the jurisdiction of a reviewing court. *AFSCME*, 145 Ill. 2d at 480.

Finally, it held that the waiver rule may be overridden where the need for "a just result and for the maintenance of a sound and uniform body of precedent" exists. *AFSCME*, 145 Ill. 2d at 480.

Based on the decision in *AFSCME*, O'Malley claims that the waiver rule should be relaxed in the instant case. She suggests that because the validity of the 1994 agreement is intertwined with the trial court's ruling on summary judgment, we should consider the issue even if waiver exists. O'Malley, however, does not argue or even suggest how her failure to replead a contract claim has anything to do with a "just result" or "the maintenance of a sound and uniform body of precedent."

We believe the supreme court relaxed the waiver rule in *AFSCME* because of the need for and maintenance of a sound body of precedent. The primary question posed by that appeal was whether Cook County's civil service system, adopted under the Counties Code, was mandatory upon the county or whether it could be altered by the county at any time. *AFSCME*, 145 Ill. 2d at 479. As noted above, the issue, according to the supreme court, had been previously decided by the court in *City of Decatur*. Because the appellate court had improperly distinguished *Decatur*, the supreme court relaxed the waiver rule and reached the merits of the appeal. *AFSCME*, 145 Ill. 2d at 479-80.

■ Based upon our reading of *AFSCME*, we find no reason to relax the waiver rule here. Instead, we rely on the general rule that, when an amended pleading is complete in itself and does not refer to or adopt the prior pleading, "the earlier pleading ceases to be part of the record for most purposes and is effectively abandoned and withdrawn." *Barnett v. Zion Park District*, 171 Ill. 2d 378, 384, 665 N.E.2d 808 (1996). Further, "[a]llegations in a former complaint not incorporated in the final amended complaint are deemed waived." *Barnett*, 171 Ill. 2d 378, 384, 665 N.E.2d 808 (1996).

Because O'Malley has waived any argument based upon the breach of contract claim she did not replead in her second amended complaint, we will limit our review to the summary judgment ruling entered by the trial court on May 15, 2002.

■ Summary judgment is proper " 'where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' [Citation.]" *Zekman v. Direct American Marketers, Inc.*, 182 Ill. 2d 359, 374, 695 N.E.2d 853 (1998). Although the summary judgment procedure is an efficient means for disposing of certain lawsuits, "it is a drastic measure that should be employed

only when the right of the moving party is clear and free from doubt. [Citation.]" *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 211-12, 670 N.E.2d 632 (1996). On a summary judgment motion, our standard of review is *de novo*. *Zekman*, 182 Ill. 2d at 374.

■ The Village first argues that it is immune from liability on O'Malley's vested rights claim under section 2—104 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2—104 (West 2000)). It also relies upon the decision in *U-Haul Co. of Chicago Metroplex v. Town of Cicero*, 87 Ill. App. 3d 915, 918, 410 N.E.2d 286 (1980), as support. Section 2—104 of the Tort Immunity Act states:

> "A local public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization where the entity or its employee is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked." 745 ILCS 10/2—104 (West 2000).

■ O'Malley claims that section 2—104 and the *U-Haul* decision are inapplicable to her vested rights claim because the Village actually approved her plan, and therefore lost the discretion to determine whether or not such authorization should be issued, denied, suspended, or revoked. O'Malley relies upon chapter 1273.05(d)(5) of the Village zoning ordinance, which states, among other things, that once a development plan has been approved, it cannot be modified. Reading section 2—104 and the Village zoning ordinance together, O'Malley argues that the Village has no immunity from liability under section 2—104 because, once it approved the plan, it no longer had the discretion to deny her that approval and therefore the immunity granted by 2—104 does not apply.

We reject this argument for several reasons.

First, O'Malley does not cite any relevant authority in support of her argument. Instead, she relies upon *United Citizens of Chicago & Illinois v. Coalition to Let the People Decide in 1989*, 125 Ill. 2d 332, 338-39, 531 N.E.2d 802 (1988). The main issue in *United Citizens* was whether the Illinois Municipal Code required an interim election for mayor of the City of Chicago. *United Citizens*, 125 Ill. 2d at 337. To resolve this question, the supreme court indicated that it had to analyze provisions in the Illinois Municipal Code and the Election Code because, while the Illinois Municipal Code was more specifically drawn, each of these codes shared the common purpose of providing a procedure in the event of a vacancy in the city's mayoral post. *United Citizens*, 125 Ill. 2d at 338-40. Specifically, the court said that when

construing statutes *in pari materia,* or statutes having a common purpose, the court's obligation "is to ascertain and give effect to the legislative intent." *United Citizens,* 125 Ill. 2d at 338. It further recognized that statutes *in pari materia* " 'should be considered with reference to one another so that both *** may be given harmonious effect. [Citations.]' " *United Citizens,* 125 Ill. 2d at 339, quoting *People v. Maya,* 105 Ill. 2d 281, 286-87 (1985).

Aside from pointing to this general proposition of statutory construction set forth in *United Citizens,* an Election Code case, O'Malley does not cite any authority that involves section 2—104 of the Tort Immunity Act. Further, O'Malley provides no authority that section 2—104 of the Tort Immunity Act and chapter 1273.05(d)(5) of the Village zoning ordinance are statutes *in pari materia,* like the Election Code and the Illinois Municipal Code in *United Citizens,* which shared the common purpose of providing a procedure in the event of a vacancy in the city's mayoral post. In the instant case, no evidence exists that section 2—104 of the Tort Immunity Act, which involves governmental immunity, and chapter 1273.05(d)(5) of the Village zoning ordinance share a common purpose.

Further, to the extent that municipal ordinances are in conflict with the Tort Immunity Act, they are invalid. *Newsome v. Thompson,* 202 Ill. App. 3d 1074, 1079, 560 N.E.2d 974 (1990). It has also been established that municipal authorities "cannot adopt ordinances which infringe the spirit of a State law or are repugnant to the general policy of the State. [Citation.]" *Newsome,* 202 Ill. App. 3d at 1079.

Supreme Court Rule 341(e)(7) (210 Ill. 2d R. 341(e)(7)) requires O'Malley to provide this court with relevant authority and failure to do so results in a waiver of the issue on appeal. *Roe v. Jewish Children's Bureau of Chicago,* 339 Ill. App. 3d 119, 125, 790 N.E.2d 882 (2003). Since she has not done so, we could find the argument waived.

In any event, O'Malley cannot prevail on the merits of this claim. O'Malley is essentially asking this court to carve an exception to the language of section 2—104. However, our supreme court has held that courts are not at liberty to create or read exceptions into statutes such as the Tort Immunity Act where the language of the enactment is clear and no exception is intended.

For example, in *Village of Bloomingdale v. CDG Enterprises, Inc.,* 196 Ill. 2d 484, 493, 752 N.E.2d 1090 (2001), the Village of Bloomingdale denied a zoning petition submitted by CDG Enterprises, Inc. (CDG), a developer. CDG petitioned the Bloomingdale planning commission to annex five parcels of land adjacent to Bloomingdale so that

CDG could build a subdivision. Bloomingdale denied CDG's project and later publicly revealed that it planned to acquire a golf course adjacent to the five parcels. Bloomingdale filed suit against CDG for failure to pay for Bloomingdale's services in reviewing CDG's petition for rezoning and site plan approval. CDG filed a counterclaim alleging that Bloomingdale deliberately frustrated CDG's business expectancy by secretly working to force CDG out of the planned development.

The trial court dismissed the counterclaim against Bloomingdale, holding that it was barred by the Tort Immunity Act. 745 ILCS 10/2—104 (West 2000). The appellate court reversed and held that the general grants of immunity afforded by the Tort Immunity Act "are limited by the common law exception for 'corrupt or malicious motives.' [Citation.]" *Village of Bloomingdale*, 196 Ill. 2d at 488.

On appeal, the supreme court considered whether the common law exception for corrupt or malicious motives could be imposed onto certain provisions of the Tort Immunity Act. The court found that, unless the Tort Immunity Act provided for such, it did not implicitly contemplate the common law exception for corrupt or malicious motives. *Village of Bloomingdale*, 196 Ill. 2d at 493. The court stated that when an " 'enactment is clear and unambiguous[,] a court is not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations[,] or conditions that the legislature did not express.' [Citation.]" *Village of Bloomingdale*, 196 Ill. 2d at 493. It concluded that because the plain language of the Tort Immunity Act's provisions did not contain an exception for corrupt or malicious motives, one could not be supplied by the courts. *Village of Bloomingdale*, 196 Ill. 2d at 493.

The supreme court also found that the appellate court's holding ignored the plain language of section 2—104 of the Tort Immunity Act, which provides that public entities are immune from liability for injury caused by the denial or by the failure or refusal to issue any permit. *Village of Bloomingdale*, 196 Ill. 2d at 495, citing 745 ILCS 10/2—104 (West 1998). The court also held that the village's denial of the defendant's rezoning petition "is precisely what the legislature intended to immunize such entities from." *Village of Bloomingdale*, 196 Ill. 2d at 495. It further found that it was immaterial whether the village's denial was based upon a corrupt or malicious misuse of power because section 2—104 contained "no reference to intent whatsoever." *Village of Bloomingdale*, 196 Ill. 2d at 496.

The court also rejected CDG's argument that Bloomingdale's denial was improper because its conduct was a deviation from the customary ministerial task of approving a zoning permit. Although the supreme court agreed that a municipality cannot claim immunity

for the improper performance of ministerial tasks, it pointed out, "[w]e have never held *** that the grant or denial of a zoning petition is a ministerial, as opposed to a discretionary, task under a tort theory of liability." *Village of Bloomingdale*, 196 Ill. 2d at 497. The court then reiterated that section 2—104 plainly grants immunity for injury caused by the denial of "any" permit and was, therefore, controlling. *Village of Bloomingdale*, 196 Ill. 2d at 497.

CDG's argument that it was injured by Bloomingdale's denial of its petition in the form of " 'theft of [CDG's] opportunity' " was also rejected. *Village of Bloomingdale*, 196 Ill. 2d at 497. The court held that the action of denial of a permit "falls squarely within section 2—104 of the [Tort Immunity] Act because [Bloomingdale] and its officials were authorized to either grant or deny CDG's petition for rezoning and site plan approval." *Village of Bloomingdale*, 196 Ill. 2d at 497. Finally, the court concluded that the Tort Immunity Act immunized Bloomingdale from liability for any alleged injury resulting from the denial of CDG's petition. *Village of Bloomingdale*, 196 Ill. 2d at 497.

In the instant case, the plain language of section 2—104 of the Tort Immunity Act does not contemplate an exception to governmental immunity when a development concept plan has been approved under chapter 1273.05(d)(5) of the Village zoning ordinance and we will not supply one. *Village of Bloomingdale*, 196 Ill. 2d at 493.

Further, we read chapter 1273.05(d)(5) to mean that once the Village approves a development plan, it cannot be "modified, revoked, or otherwise impaired," unless a public hearing is held. This language does not create an exception to section 2—104 nor does it supplant the Tort Immunity Act's clear and unambiguous language that "[a] local public entity is not liable for an injury caused by the issuance, denial *** of, or by the failure *** to issue *** any permit." 745 ILCS 10/2—104 (West 2000). Therefore, O'Malley cannot prevail whether the Village Board approved or refused her development plan. *Village of Bloomingdale*, 196 Ill. 2d at 497.

O'Malley's reliance upon chapter 1273.05(d)(5) of the ordinance, which states, once a "development concept plan has been approved," it "shall not be modified, revoked or otherwise impaired," is misplaced. Village of Palos Park Planning and Zoning Code ch. 1273.05(d)(5) (1985). For the reasons that we discuss below, this provision was never triggered because O'Malley's development plan was never approved.

O'Malley relies upon the following evidence in support of her claim that the development plan was approved and that she satisfied all of the requirements under chapter 1273: First, a letter from Village officials dated August 8, 1997, which advised O'Malley that the develop-

ment plan approval process was controlled by chapter 1273. Second, the minutes of the Village plan commission meeting dated October 16, 1997, which indicated that the plan commission recommended that the Village Board approve the development plan "contingent upon" review and approval of five items by the Village engineer. Third, a letter from the Village plan commission to the Village Board dated October 24, 1997, which stated that the plan commission recommended that the Village Board approve the development plan "contingent upon" the review and approval of five items by the Village engineer. Fourth, statements made at the Village Board meeting on November 10, 1997, where the Village Board approved the development plan "subject to the confirmation that the 1994 extension to the annexation agreement was in order." Fifth, a letter to O'Malley from the Village dated November 12, 1997, indicating that O'Malley needed to furnish submittals for the Village plan commission as required by chapter 1273. Sixth, a letter from the Village to a consultant dated November 14, 1997, stating that the development plan was approved by the Village Board at its November 10, 1997, meeting. Finally, O'Malley contends that the testimony of James Madden, the Village commissioner, and Donald Jeans, the Village mayor, establishes that the validity of the annexation agreement and approval of the development plan had nothing to do with one another so long as O'Malley followed the requirements of the ordinance. In a discovery deposition, Madden testified that the validity of the 1981 agreement and S—1 zoning were separate issues. Jeans testified in a discovery deposition that whether O'Malley had met all the requirements for the development plan had nothing to do with the 1981 agreement.

We agree with the Village that none of the evidence relied upon by O'Malley raises a question of material fact that the Village approved the development plan. In fact, the evidence, at most, demonstrates that the Village conditionally voted to approve the development plan only if the 1994 agreement was valid and enforceable. The minutes of the November 10, 1997, Village Board meeting clearly establish that the Board approved the development plan "subject to the confirmation that the 1994 extension to the annexation agreement was in order." Further, the minutes of the November 24, 1997, Board meeting demonstrate that the Board did not approve the development plan and tabled the approval because a review of the Village records indicated that there was no public notice given and no public hearing held with regard to the execution of the 1994 agreement. In sum, there never was any approval of O'Malley's development plan.

Moreover, as pointed out by the Village, "the official acts of municipal corporations must be recorded and the records are the only

lawful evidence of the action to which they refer." *Western Sand & Gravel Co. v. Town of Cornwall*, 2 Ill. 2d 560, 564, 119 N.E.2d 261 (1954). Here, the Village minutes control, and the correspondence relied upon by O'Malley above and the testimony of Madden and Jeans, taken more than four years after the Village meetings in November 1997, do not raise questions of material fact regarding approval of O'Malley's plan.

Further, in *Village of Bloomingdale*, the supreme court held that liability for detrimental reliance based on assurances made by village officials was precluded by the Tort Immunity Act. The court noted that section 2—106 of the Tort Immunity Act provides that a "local public entity is not liable for an injury caused by an oral promise or misrepresentation of its employee, whether or not such promise or misrepresentation is negligent or intentional." 745 ILCS 10/2—106 (West 2000); *Village of Bloomingdale*, 196 Ill. 2d at 497. Based on section 2—106, the court found that Bloomingdale was immune from liability for any injury resulting from a village official's assurance that the project would be approved. *Village of Bloomingdale*, 196 Ill. 2d at 497. It therefore rejected CDG's detrimental reliance argument.

As we set forth above, a public hearing and requisite notice are required when an annexation agreement is amended under section 11—15.1—3 of the Illinois Municipal Code. 65 ILCS 5/11—15.1—3 (West 2000). Unlike section 11—15.1—3, section 11—15.1—5, which applies to the extension of existing annexation agreements, does not require a public hearing and accompanying notice. 65 ILCS 5/11—15.1—5 (West 2000). In her brief, O'Malley asserts that because the 1994 agreement was not an amendment to the original annexation agreement, it was subject to section 11—15.1—5 and did not require a public hearing and accompanying notice to be valid.

We find that the 1994 agreement did amend the original annexation agreement and therefore was an amendment subject to section 11—15.1—3. The 1994 agreement specifically states:

> "The Annexation Agreement heretofore entered into between OWNER and VILLAGE be and is hereby extended to August 9, 2001 with the following amendments:
>
> Paragraph 3(c) of the Annexation Agreement is amended by deleting 'eight dwelling units per acre' and inserting 'seven dwelling units per acre.' "

The amendatory language in the 1994 agreement could not be more clear. We conclude that the 1994 agreement was invalid because it was an amendment to the original annexation agreement and thus required notice and a hearing pursuant to section 11—15.1—3 of the Illinois Municipal Code.

Chapter 1273.05(d)(4)(C) of the village ordinance provides that if the Village Board does approve a development plan, it shall do so "by ordinance duly adopted." All the evidence demonstrates that the Village Board never approved O'Malley's development plan and never adopted any ordinance. As pointed out above, the approval of the plan was "subject to" the 1994 agreement being "in order." At the Village Board meeting on November 10, 1997, the Village attorney stated that "if the [Village Board] members approved the concept plan \*\*\*, there would be a concept approval ordinance adopted at a December meeting." On November 24, 1997, the Village Board "tabled" the development plan because "Village staff \*\*\* determined that there was no public notice published, and no public hearing held, in regard to the" 1994 agreement. O'Malley's development plan was never approved by ordinance duly adopted as required by chapter 1273.05(d)(4)(C).

■ Finally, even if the Village did approve O'Malley's development plan or O'Malley had a vested right to the approval (which we do not find), section 2—104 of the Tort Immunity Act still shields a local public entity "for an injury caused by the issuance \*\*\* of \*\*\* any permit \*\*\* where the entity \*\*\* is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked." 745 ILCS 10/2—104 (West 2000).

*U-Haul Co.*, 87 Ill. App. 3d at 918, is further support for our determination. In *U-Haul*, the plaintiff, U-Haul Co., sought a special use permit from the defendant, the Town of Cicero, to allow the development of a U-Haul rental business on the subject premises. After a hearing, the board of trustees of Cicero denied U-Haul's permit application. U-Haul then filed a three-count complaint in the trial court. Specifically, count III alleged that U-Haul had an absolute right to have a license issued without a special use application. Subsequently, the trial court granted Cicero's motion to dismiss U-Haul's entire complaint and U-Haul appealed.

On review, the appellate court, *sua sponte*, affirmed the trial court's dismissal of count III and found that section 2—104 of the Tort Immunity Act rendered the defendant immune from suit regarding the denial of U-Haul's special use permit. *U-Haul*, 87 Ill. App. 3d at 918-19.

As in *U-Haul*, we find that section 2—104 of the Tort Immunity Act renders the Village immune from suit regarding its rejection of O'Malley's development plan. O'Malley offers no relevant authority that requires the opposite conclusion.

Therefore, we conclude that the Tort Immunity Act precludes any liability against the Village for either the denial, approval, or refusal of O'Malley's development plan. Because of our finding that the Vil-

584

lage is immune from liability in this case, we need not address any other issues raised by O'Malley. The trial court's grant of summary judgment in favor of the Village is affirmed.

Affirmed.

O'MALLEY, P.J., and McNULTY, J., concur.